☐ORIGINAL

FILED
CLERK U.S. DISTRICT COURT

MAR 24 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Ellen K. Wolf (SBN 110686)
ewolf@wolfgroupla.com
Christopher B. Good (SBN 232722)
cgood@wolfgroupla.com
**WOLF GROUP L.A.**
11400 W. Olympic Blvd., Suite 200
Los Angeles, CA 90064
Telephone: (310) 460-3528
Facsimile: (310) 457-9087

Attorneys for Plaintiff
American National Trading Corp.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

AMERICAN NATIONAL TRADING CORP., a California corporation

Plaintiff,

vs.

MCGLADREY & PULLEN, LLP, an Iowa Limited Liability Partnership; RSM MCGLADREY, Inc. a Delaware corporation; G. VICTOR JOHNSON, an individual; PAUL NOCKELS, an individual and DOES 1 - 10, INCLUSIVE,

Defendants.

CASE NO. CV-08-5325 PA (MANx)

**SECOND AMENDED COMPLAINT**

Plaintiff American National Trading Corp. hereby alleges as follows:

## JURISDICTION AND VENUE

1.    The Federal District Courts have jurisdiction over the claims pursuant to 28 U.S.C. §1332 as there is complete diversity between the parties and the amount in controversy is in excess of $75,000, exclusive of interests and costs. Jurisdiction is also proper under 28 U.S.C. §1331 pursuant to the Racketeering Claims under 18 U.S.C. §1961 et seq and the Commodity Exchange Act Claim

1 | under 7 U.S.C. §25. Venue is proper in the Central District of California pursuant to
2 | the provisions of 28 U.S.C. §1391.

3 | **PARTIES**

4 | 2.      Plaintiff American National Trading Corp. ("ANTC"), is a Corporation,
5 | properly qualified to do business in the County of Los Angeles, with a principal
6 | place of business in Los Angeles, CA and a citizen of the State of California.

7 | 3.      At all relevant times, ANTC was registered with the Commodities
8 | Futures Trading Commission ("CFTC") as a non-clearing Futures Commission
9 | Merchant ("FCM"). ANTC is also a member of the National Futures Association
10 | ("NFA"), which is CFTC's designated self-regulatory organization ("DSRO").

11 | 4.      Plaintiff is informed and believes and thereon alleges that Altschuler,
12 | Melvoin & Glasser LLP ("AM&G") is a national accounting and auditing limited
13 | liability partnership. Plaintiff is informed and believes and thereon alleges that at all
14 | relevant times until its merger into M&P in 2006, AM&G served as the independent
15 | auditor of Sentinel and ANTC, as well as many other Sentinel clients.

16 | 5.      Plaintiff is informed and believes and thereon alleges that Defendant
17 | M&P is a national accounting and auditing limited liability partnership with
18 | headquarters in Bloomington, Minnesota. Plaintiff is informed and believes and
19 | thereon alleges that in November of 2006, M&P acquired AM&G in a legal merger,
20 | and at all relevant times thereafter, M&P served as the independent auditor of both
21 | Sentinel and ANTC, as well as many other Sentinel clients. Any references to
22 | "M&P, and/or its legal predecessor AM&G" refer to acts of M&P and AM&G, prior
23 | to its legal merger in M&P.

24 | 6.      Sentinel Management Group, Inc. ("Sentinel") is an Illinois
25 | corporation, headquartered in Northbrook, Illinois. Sentinel is registered with the
26 | SEC as an investment adviser and with the CFTC as an FCM. It is also a member of

27 |
28 |

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1   the National Futures Association ("NFA"), which is the CFTC's designated self-
2   regulatory organization ("DSRO").

3         7.     Philip Bloom, Eric Bloom, and Charles Mosley ("the Sentinel
4   Insiders") were officers and directors of Sentinel who breached their fiduciary duties
5   to Sentinel and orchestrated multiple schemes to defraud Sentinel's clients. There
6   were at all relevant times one or more officers and employees of Sentinel who were
7   not part of the Sentinel Insiders' scheme. As discussed below, M&P was required to
8   disclose certain regulatory violations and material inadequacies in Sentinel's
9   internal controls to certain regulators if Sentinel itself failed to do so.

10         8.     Plaintiff is informed and believes and thereon alleges that Defendant G.
11   Victor Johnson ("Johnson") is an individual who at all times relevant herein resides
12   in Illinois and is doing business in the County of Chicago, State of Illinois. Plaintiff
13   is further informed and believes that at all relevant times Johnson was a certified
14   public accountant licensed in Illinois and was a partner of AM&G until its
15   acquisition by McGladrey & Pullen LLP in 2006 at which time he became a partner
16   of M&P. Plaintiff further alleges that Johnson served as the engagement partner for
17   the audits of Sentinel, and on information and belief served in some capacity as an
18   auditor of Sentinel for several of the relevant years prior to 2006.

19         9.     Plaintiff is informed and believes and thereon alleges that Defendant
20   Paul Nockels ("Nockels") is an individual who at all times relevant herein resides in
21   Illinois and is doing business in the County of Chicago, State of Illinois. Plaintiff is
22   further informed and believes that at all relevant times Johnson was a certified
23   public accountant licensed in Illinois and was a partner of AM&G until its
24   acquisition by M&P in 2006 at which time he became a partner of McGladrey &
25   Pullen LLP. Plaintiff further alleges that Nockels served as the engagement partner
26   for the work and audits of ANTC from 2004-2007. On information and belief,
27   Nockels had a longstanding personal relationship with Philip and Eric Bloom (two

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  of the Sentinel Insiders).

2      10.    Larry Kaplan was a partner of AM&G in 2004 and on information and
3  belief had a longstanding personal relationship with Philip and Eric Bloom (two of
4  the Sentinel Insiders).

5      11.    Plaintiff is informed and believes that Nockels and Johnson were co-
6  employed by RSM McGladrey, Inc., a Delaware corporation ("RSM"), M&P and
7  RSM have an alternative practice structure whereby M&P provides accounting and
8  auditing services, and RSM provides tax and business consulting services. On
9  information and belief, post merger, Nockels and Johnson referred to M&P and
10  RSM interchangeably, and provided business cards for both entities, and since
11  several of Nockels's and Johnson's actions complained of herein are of a business
12  consulting nature, it is proper for RSM to be held responsible, under the doctrine of
13  *respondeat superior,* for the conduct of Nockels and Johnson, and the other
14  McGladrey employees involved in the conduct related to Sentinel and ANTC
15  implicated by this complaint.

16      12.    Plaintiff is informed and believes and on such basis alleges that
17  Nockels and Johnson were previously employed by AM&G, which was acquired by
18  and merged into M&P in November 2006. As a result, M&P has successor liability
19  for the acts and liabilities of AM&G, and its employees Johnson and Nockels, prior
20  to M&P's purchase thereof.

21      13.    Plaintiff is informed and believes and on such basis alleges that
22  Nockels and Johnson were previously employed by, AM&G, and working in that
23  capacity on (respectively) the ANTC and Sentinel accounts, and engaging in the acts
24  as alleged herein, in an alternative tax practice structure with American Express Tax
25  and Business Services (TBS), which was acquired by Defendant RSM McGladrey
26  on or about October 1, 2005.  On this basis, RSM has successor liability for the acts
27  and liabilities of AM&G, and its employees Johnson and Nockels, prior to RSM's

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  purchase thereof.

2      14.   It is unknown to plaintiff at this time precisely which conduct of
3  Defendants Nockels and Johnson was undertaken as employees of RSM  and which
4  conduct was undertaken as employees of M&P, or if there is in fact any distinction
5  between the two companies, which may in fact be alter egos of one another.
6  Defendant Nockels used and worked under the auspices of both such business
7  names interchangeably and gave business cards to plaintiff under both such
8  company names.  Plaintiff is informed and believes and on such basis alleges that
9  Defendant Johnson similarly used and worked under the auspices of both such
10  business names interchangeably and indiscriminately.   For that reason, RSM
11  McGladrey, Inc. and McGladrey & Pullen are sometimes referred to collectively
12  herein as "M&P".

13      15.   The true names and capacities, whether individual, corporate, partner or
14  otherwise of Defendants sued herein as Does 1 through 10, inclusive, are unknown
15  to Plaintiff, who therefore sue such Defendants by such fictitious names.  Plaintiff is
16  informed and believes that each of the Defendants is in some way responsible for
17  the acts complained or herein.  Plaintiff will seek leave to amend this Complaint
18  adding the true names and capacities of each of the Doe Defendants when the same
19  have been ascertained.

20      16.   Plaintiff is informed and believes, and thereon allege that at all times
21  herein mentioned, each of the Defendants was the agent of each of the other
22  Defendants, and in doing the things hereinafter mentioned, was acting within the
23  scope of such agency and with the permission, authority and consent of the other
24  Defendants.

25

26        **NATURE OF THE ACTION – ALLEGATIONS COMMON TO ALL**
27                                **COUNTS**

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1

2      20.    This action arises out of Defendants' involvement and participation in,

3   and furtherance of, massive wrongdoings perpetrated by Sentinel Management

4   Group, Inc. ("Sentinel"), a registered investment adviser based in Northbrook,

5   Illinois, under the direction of, among others, Sentinel directors and officers Philip

6   Bloom, Eric A. Bloom, and Charles K. Mosley ("Mosley") (the "Insiders" or

7   "Sentinel Insiders").

8      21.    At all times relevant hereto, in its status as a registered Futures

9   Commission Merchant ("FCM"), Sentinel was permitted and suited to hold and

10   manage investment portfolios ("Client Portfolios") for other FCMs (including

11   ANTC, as Sentinel was subject to the same regulatory investment mandates as

12   ANTC, including but not limited to the requirements that its customer funds be

13   properly segregated in accordance with applicable law and regulations, that assets

14   purchased on behalf of its clients be of the highest investment grade and liquidity,

15   and that clients would be able to withdraw their assets on a same day basis.   At all

16   times relevant hereto, Sentinel represented to its clients on a daily basis, including

17   ANTC, and Defendants certified and represented in reports at least annually if not

18   more frequently, that such requirements were being met.

19      22.    In fact, these requirements were not being met, which Defendants

20   knew, and which Defendants Johnson, Nockels, M&P (and its predecessor), and

21   RSM, hid and concealed from ANTC and others in false reports and otherwise

22   beginning in at least 2003, all as hereinafter alleged.  Although not discovered by

23   ANTC until August 2007, at some earlier point in time possibly dating back to 2003,

24   Sentinel, with Defendants' assistance, began leveraging and de-segregating the

25   customer funds deposited with Sentinel, collateralizing those funds against bank

26   loans and other high risk vehicles, and concealing same from ANTC and other

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1 | clients, and from the regulators, using false reports prepared and/or countenanced by
2 | Defendants Johnson, RSM and M&P, all as hereinafter alleged.

3 |     23.    The gist of the RICO claims in this Complaint against Defendants, as
4 | hereinafter alleged, is that Defendants participated with Sentinel in falsifying and
5 | certifying false information an illicit scheme involving, inter alia, elements of mail
6 | and wire fraud, bank or lender fraud, misappropriate/theft of funds illicitly obtained
7 | and held in trust, Ponzi scheme or "kiting", and fraud, defalcation and breach of
8 | fiduciary duty ("the Illegal Scheme"). Defendants' conduct, all as hereinbelow more
9 | specifically alleged, included falsely reporting and certifying several times each year
10 | from 2003 – 2007 the continued segregation and regulatory compliance of the
11 | Sentinel accounts, and concealing and failing to disclose same to ANTC and others,
12 | when the true facts, known to Defendants, were that Sentinel was diverting
13 | plaintiff's customer funds and using same as collateral for highly leveraged loans
14 | and investments, skimming money therefrom.

15 |     **24.**    Further, Plaintiff is informed and believed and based on such
16 | information and belief alleges that Defendants Nockels, M&P and RSM (and its
17 | predecessor entity AM&G) induced ANTC and their other clients to entrust Sentinel
18 | with their assets, provided ANTC and others with false information, falsified
19 | Sentinel financial statements and regulatory documents, counseled Sentinel as to
20 | avoiding regulatory oversight and/or concealing its wrongdoings, and assisted in
21 | concealing Sentinel's fraudulent schemes from Sentinel's clients and regulators
22 | alike.

23
24
25 | ## ALLEGATIONS COMMON TO ALL COUNTS

26 |     25.    In and before 2006, Sentinel and its Insiders engaged in a fraudulent
27 | and illegal scheme, by which Sentinel leveraged, borrowed against, and effectively
28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  de-segregated the customer funds, which were supposed to have been segregated
2  and held in safe highly liquid investments, while all the while continuing to
3  represent to ANTC and others that the customer funds remained safely segregated
4  and properly managed in compliance with CFTC and related regulations. Sentinel
5  and its Insiders engaged in the illegal scheme to have continued access to funds for
6  their own profit purposes, by creating the appearance of high cash returns, but while
7  creating unmanageable future liabilities and falsifying that its customers money was
8  safely segregated and invested and in high quality, highly liquid assets by providing
9  them with daily statements that bore false return rates, false assets, false asset basis,
10 and false asset values. Sentinel and its Insiders, with the assistance of Defendants
11 Johnson, Nockels, M&P and RSM, concealed from ANTC and others that the
12 customer's assets had been encumbered and had been illegally used to collateralize a
13 line of credit, and in fact, represented to the contrary.

14     26.    At all times relevant hereto, Defendants Johnson, Nockels, M&P and
15 RSM were accountants, selling their services as outside accounts, particularly in the
16 money manager/broker industry, and Johnson and M&P and RSM (and its
17 predecessor AM&G) were the outside accountants hired by Sentinel to advise, audit
18 and certify Sentinel's financial statements and compliance reports to regulatory
19 agencies.

20     27.    Plaintiff is informed and believes and on such basis alleges that
21 Defendants' conduct and involvement in the wrongful schemes alleged herein were
22 motivated by Defendants' profits and by their desire to be and maintain their status
23 as prominent outside accountants in the money manager/broker industry, all of
24 which would have been quickly negated and destroyed had Defendants not
25 participated in the wrongful schemes as alleged herein. In addition, had RSM or
26 M&P disclosed to ANTC the true state of affairs at Sentinel, RSM and M&P's

27
28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  involvement in Sentinel's wrongdoing would have been exposed with resulting
2  liability.

3      28.    At all times material hereto, Defendants Nockels and RSM and M&P
4  (and its predecessor AM&G) were concurrently the outside accountants charged
5  with advising, investigating, auditing and certifying plaintiff ANTC's financial
6  statements and compliance reports to regulatory agencies.

7      29.    In such position, in which Defendants Nockels, RSM and M&P were
8  trusted to advise plaintiff of all risks or potential regulatory non-compliance issues
9  in plaintiff's business practices, and in which Defendants Johnson, RSM and M&P
10  were participating in Sentinel's false information and false reports to its clients and
11  regulatory agencies of which Nockels was or should have been aware, Defendants
12  were uniquely positioned to hide and conceal from ANTC the wrongdoings of
13  Sentinel, and thus to participate in, facilitate and further the wrongdoings of
14  Sentinel, all to ANTC's damage, as alleged herein.

15      30.    "M&P" and its legal predecessor Altschuler, Melvoin & Glasser LLP
16  ("AM&G"), through Paul Nockels ("Nockels") and Larry Kaplan ("Kaplan") – long
17  time personal friends of Eric and Philip Bloom, induced ANTC to utilize Sentinel's
18  asset management service despite knowing full well about, and being participants
19  of, Sentinel's Ponzi and other schemes. Further, M&P and AM&G, again through
20  Nockels and his audit team, provided ANTC with false year end financial statements
21  and other regulatory documents to conceal Sentinel's fraud in order to induce ANTC
22  to continue to use Sentinel.

23      31.    In addition, M&P and AM&G, through G. Victor Johnson ("Johnson")
24  and his audit team, falsified financial and regulatory documents, for Sentinel.
25  Additionally, M&P and AM&G through Nockels, Johnson, and other employees
26  and principles, consulted with and counseled Sentinel as to how best avoid
27  regulatory oversight and conceal its vast wrongdoings.

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1    32.    As a result of Defendants' fraud and participation in Sentinel's

2  schemes, ANTC was unaware that Sentinel did not have the liquidity it required to

3  operate and be in compliance with the regulatory requirements, and that it did not

4  own the assets that Sentinel had represented it owned. Thus, when Sentinel's

5  extreme overleveraging finally caught up with it, and Sentinel was only able to

6  return to ANTC 70% of ANTC's assets, ANTC was forced to "fire sale" all of its

7  assets to avoid a regulatory shutdown.

8

9                              **ANTC'S BUSINESS**

10    33.    As a non-clearing FCM, ANTC would invest clients' funds in futures

11  and options on futures contracts via the use of clearing FCMs ("clearing houses")

12  that traded on relevant exchanges. ANTC, as required by law, maintained a

13  customer segregated account for its clients' funds

14    34.    ANTC's clients would deposit their funds into ANTC's customer

15  segregated account at Wells Fargo Bank, and ANTC would then use those funds to

16  purchase futures and options contracts and other assets using clearinghouses.

17    35.    Due to the nature of futures trading, ANTC was only required to

18  transfer a portion of the cost of a trade to a clearinghouse for any given trade. As a

19  result, ANTC often had surplus client funds remaining in its segregated account at

20  any given time.

21    36.    Despite the requirement that ANTC maintain a segregated account for

22  its customer's funds, ANTC was permitted by law and contractually by its clients, to

23  earn interest on those funds[1]. Thus ANTC generated operating income from fees and

24  commissions on trades, *and* the income derived from the unallocated customer

25  funds.

26

27

28  [1] 17 C.F.R. § 1.23 grants FCMs a "residual financial interest" in their customer funds.

1   37.   CFTC regulations limit the options for earning income on such funds;
2   the funds can either be invested directly by the FCM in high grade and highly liquid
3   corporate securities or the FCM can deposit the funds in other FCMs that are
4   constrained by the same rules and regulations.

5   38.   As will be further alleged herein, ANTC was induced, by virtue of the
6   many frauds perpetrated by Defendants, to deposit its available customer funds with
7   Sentinel as its operations permitted. Accordingly, on April 27, 2004, ANTC entered
8   into an Investment Advisory Agreement with Sentinel (the "Investment Advisory
9   Agreement").

10   39.   Paragraph 5(a) of the Investment Advisory Agreement states:
11   "[ANTC's] Assets shall be deposited in one or more custodial accounts (each, an
12   'Account') maintained at the Bank of New York…('Custodian'). All Assets shall be
13   deposited with Custodian and held for the benefit of [ANTC]. The Custodian shall
14   be responsible for the custody and possession of the Assets, the collection of
15   interest, dividends and other income attributable to the Assets and the settlement of
16   transactions for the Account."

17   40.   Paragraph 5(b) of the Investment Advisory Agreement states: "Sentinel
18   shall not own nor have any interest in funds or securities in the Account or of any
19   other funds or securities in which [ANTC] has a beneficial interest…"

20   41.   Paragraph 5(c) of the Investment Advisory Agreement states: "[ANTC]
21   shall be able to withdraw all or any part of the funds on deposit or add additional
22   funds thereto upon notice to Sentinel…"

23   42.   ANTC paid Sentinel a management fee which was deducted from the
24   gross interest earned by Client each day.

25   43.   Thus, According to the Investment Advisory Agreement, ANTC would
26   deposit and withdraw its customer funds to and from Sentinel as ANTC's operating
27   conditions would allow, and ANTC would earn interest on the daily balance.

28

LAW OFFICES
WOLF GROUP L.A.
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

## FRAUDULENT SCHEMES

44.     What ANTC did not know, was that the funds it deposited with Sentinel were actually being misappropriated by Sentinel to fuel a massive illicit scheme, involving elements of Ponzi scheme, lender and bank fraud, and embezzlement, fraud and defalcation in a fiduciary capacity, orchestrated by Sentinel and perpetrated by Sentinel and the Defendants.

**CEA and CFTC Regulation**

45.     Like ANTC, Sentinel, an FCM, was subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"), and the rules and regulations of the CFTC, 17 C.F.R. §§ 1.1 – 190.10.

46.     Section 4d(a)(2) of the CEA requires that money, securities, and property deposited by customers be segregated from the funds of the FCM.

47.     Section 4d(b) of the CEA prohibits an FCM from holding, disposing, or using its customer segregated funds for any other person or entity other than its customers who deposited the funds.

48.     Section 4g of the CEA imposes upon FCMs stringent reporting and recordkeeping requirements.

49.     CFTC Rule 1.20(a) provides that all customer funds shall be segregated on behalf of customers and shall be deposited under an account name that clearly identifies them as customer property[2]. CFTC Rule 1.20(a) also prohibits the

---

[2] To that end, Sentinel created three customer accounts with BoNY: Seg 1, Seg 2, and Seg 3. Seg 1 was for funds of other FCMs that only traded domestically, Seg 2 was for funds of FCMs that traded internationally, and Seg 3 was for funds of all other non-FCMs and FCM house funds. ANTC only had funds deposited in Seg 1.

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  pledging of customer funds to secure a bank loan for any purpose other than for

2  commodity transactions for that customer. Moreover, CFTC Rule 1.26 requires a

3  written acknowledgement from the depository bank that the assets are customer

4  assets and are being held in compliance with the CEA.

5

6    50.    Under CFTC Rule 1.25, FCMs' customers' funds can be used to

7  purchase only high grade corporate and government bonds and similar highly liquid

8  investments, with limited exceptions only those rated AAA. CFTC Rule 1.25

9  permits FCMs to use Repo agreements in connection with the investment of

10  customer funds, but only if the assets involved in the Repo transactions are the types

11  permitted under Rule 1.25. Moreover, the CEA and CFTC rule 1.25(d)(8) require

12  that all repurchase transactions for customers settle solely in the customer

13  segregated accounts. In telephone conversations with ANTC prior to and after

14  ANTC was induced into opening an account with Sentinel,  Eric Bloom specifically

15  referred to the Seg 1 fund within which ANTC placed customer funds, as "The 1.25

16  Account," thereby further establishing that Sentinel was very aware of the strict

17  guidelines they were to follow with highly regulated FCM customer funds.

18

19    51.    Under CFTC Rule 1.10, Sentinel was required to file on a monthly and

20  year end basis a Form 1-FR with the CFTC containing a statement of financial

21  condition, a statement of segregation, and a statement of the computation of

22  minimum capital requirements. Sentinel was also required under CFTC Rule 1.32 to

23  compute on a daily basis the total amount of customer funds on deposit in

24  segregated accounts and the amount of funds required to be segregated to meet

25  Sentinel's liabilities to customers.

26

27

28

52.    In addition, CFTC Rule 1.10 required an independent auditor to certify Sentinel's year-end Form 1-FR, which contained a statement of segregation and a statement of the computation of minimum capital requirements and was required to be filed no later than 90 days after the close of Sentinel's fiscal year. The year-end Form 1-FR was required to, amongst other things, contain appropriate footnote disclosures and any other information necessary to make the statements not misleading and be provided to the CFTC and NFA along with the independent auditor's report on those statements. Further, CFTC Rule 1.16 (which establishes auditing guidelines) expressly incorporates the segregation and net capital requirements under the CEA and CFTC regulations and sets forth the requirements of the audit to be performed pursuant to CFTC Rule 1.10.

53.    Johnson and an audit team, working under M&P and its predecessor AM&G, were responsible for and provided the audits and certifications referenced in this section, from 2003 through 2007.   As such, Johnson and M&P knew of the requirements and the reasons therefore, to assure Sentinel's compliance with CFTC regulations and thus the compliance of Sentinel's and M&P's other clients including ANTC.

54.    Johnson and M&P falsified such certifications and audit reports, in that they knew of the wrongful schemes, and aided and facilitated the schemes by their own conduct.

55.    Nockels and M&P and RSM knew of the requirements and the reasons therefore, to assure ANTC's compliance with CFTC regulations.  Nockels, M&P and RSM at all times knew that ANTC was placing its customer funds with Sentinel from 2003 – 2007.

**The Ponzi Scheme**

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

56.    Upon information and belief, plaintiff alleges that beginning no later than 2003, Sentinel and AM&G embarked upon a massive wrongful scheme, including among other things mail and wire fraud, Illegal scheme to defraud ANTC and their other clients.

57.    Sentinel would misappropriate (effectively steal) the client assets that were being maintained in the segregated customer accounts at BoNY, and used those assets along with its own assets to obtain bank loans and to purchase on a highly leveraged basis extremely risky, low grade, and low liquidity assets (the "Toxic Assets").

58.    These Toxic Assets were comprised of private equity, esoteric collateralized debt obligations ("CDOs"), and other similar high risk-low liquidity assets.

59.    Sentinel would then hold the assets in its own name, and collect all the interest generated by the assets on a daily basis.

60.    Instead of paying all the interest to its clients less its management fee, as contractually obligated to do, Sentinel would fabricate an interest rate to be paid to its customers based on interest rates realized by clients of Sentinel's competitors. Sentinel would then pocket the difference between the fabricated interest rates it paid its customers and the actual interest rate it realized. Typically this amount would far exceed the management fee that Sentinel was entitled to receive under its Investment Advisory Agreements.

61.   At the end of each day, Sentinel would provide its clients with account statements in which Sentinel fabricated assets that the client owned, fabricated the cost basis of those assets, fabricated the interest earned on those assets, and failed to disclose that the assets listed were encumbered by Repo transaction counterparties and BoNY.

62.   Sentinel financed the purchase of these Toxic Assets and in fact all assets fraudulently purchased by Sentinel, using a combination of Repo transactions and the BoNY Loan.

63.   In its simplest form, a Repo transaction is carried out by three parties: a broker, a buyer, and a Repo counterparty. Typically a broker will offer for sale to the buyer an interest generating asset. The buyer will then contract with the Repo counterparty to pay the broker for the interest generating asset on behalf of the buyer. However, typically, the Repo counterparty will not advance the total cost of the interest generating asset, and the buyer is required to finance the difference (the "Haircut"). After the broker is paid, the Repo counterparty takes possession of the interest generating asset, but the buyer is still entitled to the interest generated from it. In return, the buyer agrees to buy the interest generating asset back at some future date for a specified value.

64.   In practice, Sentinel would contract with a Repo counterparty to buy Toxic and other assets (in Sentinel's own name), for which Sentinel would finance the Haircut (typically about 10% of the value of the asset) with the BoNY Loan. Sentinel would then agree to buy the asset back from the Repo counterparty, usually upon demand of the Repo counterparty.

65. Sentinel's conduct was tantamount to attempted theft of its customer assets, and it was also tantamount to bank fraud, as it used and pledged such assets as collateral for the BoNY loan.

66. Instead of keeping its customer's assets in their properly segregated accounts, Sentinel would cause those assets to be transferred into a clearing/collateral account (the "Collateral Account"). As additional funds were needed by Sentinel to finance its Repo transactions, pay Repo counterparties, or honor customer withdrawals, Sentinel would misappropriate additional customer assets and pledge them as collateral for additional loan amounts, with loans from BoNY made in the name of Sentinel.

67. Instead of being used to purchase assets for its clients, Sentinel's clients' deposits with BoNY were now used by Sentinel to first pay customer withdrawals, and if any funds were left over, were used to pay down the balance of the BoNY loan.

68. In this way, Sentinel was able to pay interest to its clients by an illicit scheme, and creating massive future liabilities based on the leverage obtained illegally through the BoNY Loan and the Repo transactions. Sentinel could only keep afloat while new customer money was pouring in, and/or while the Toxic Asset values were appearing to hold or increase. It was only a matter of time until the Ponzi or Kiting scheme collapsed, as it did in August of 2007.

**The Money Laundering Scheme**

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

69.     Upon information and belief, on a daily basis, Sentinel Insiders would transfer their ill-gotten gains from the Ponzi scheme from the Collateral Account to other Sentinel accounts where it was intermittently transferred still to other accounts and interests controlled by the Sentinel Insiders. The transfers would be given misleading names in order to conceal the true nature of the funds.

70.     In addition to the Collateral Account, Sentinel had several other accounts which were controlled by the Insiders (the "House Accounts"). On a daily basis, Sentinel would transfer cash derived from its ill-gotten management fee, cash derived from the liquidation of assets financed by the BoNY Loan, and other non-cash assets financed by the BoNY Loan into its House Accounts.

71.     From the house accounts, the funds would be transferred directly to the Sentinel Insiders private accounts or other interests they controlled.

72.     The transfers would be falsely labeled "administrative fee" or "bonus," or the funds would be used by Sentinel to pay personal bills and expenses of the Insiders.

73.     Sentinel Insiders also used Sentinel's parent company Sentinel Investment Group ("SIG"), which Eric Bloom controlled, as a money laundering vehicle, with the direct involvement of M&P, RSM, and Johnson, who assisted in the creation of a fraudulent, back dated management agreement, to use as a pretext for the transfer of funds from Sentinel to SIG

74.     Under the pretext of "administrative" or "management" fees transferred from Sentinel to SIG over the course of almost a year, the Sentinel Insiders laundered unknown millions of dollars through SIG alone.

## DEFENDANTS' ROLES IN THE ILLEGAL SCHEMES

75. From the very outset, Defendants, or their legal predecessors, were aware of and intricately involved in both the Illegal schemes.

76. Defendants, or their legal predecessors, promoted Sentinel to their clients, and induced their clients to hire Sentinel; they provided guidance to Sentinel as how to best avoid regulation; they assisted Sentinel in the falsification and fabrication of documents; they falsified and fraudulently certified year end financial statements and year end Form 1-FRs not only for Sentinel, but for their other clients as well who were using Sentinel; they falsified yearly SEC Rule 206(4)-2 segregation audits; and they fabricated documents necessary for the Money Laundering scheme.

77. In short, M&P's role was to induce companies to use Sentinel and thereafter conceal from them, and regulators, the wrongdoing that was occurring. M&P's, or its legal predecessor AM&G's, audits were pure pretext to conceal any signs of impropriety between M&P and Sentinel. In fact, M&P, and/or its legal predecessor AM&G, needed not to perform any audit at all, since it was already fully aware of the Illegal schemes, and already knew what it was going to write in its audit reports, and that it was going to certify Sentinel's documents, as well as those financial statements and regulatory forms of Sentinel's customers that it also audits. Case in point: when ANTC inquired upon Nockels how he planned on testing ANTC's use of Sentinel, Nockels responded, and in fact made the claim on a number of occasions, that "[he] [didn't] need to test Sentinel's numbers and statements because [he] knew the firm and knew the statements were correct."

1   78.   By acting under the guise of "independent auditor" (although nothing

2   could be farther from the truth) and conducting sham audits of Sentinel and several

3   of its clients, M&P, and/or its legal predecessor AM&G, was able to create the

4   illusion that Sentinel was a safe, fully SEC, CEA, and CFTC compliant business. An

5   illusion that lulled Sentinel's clients and regulators alike, into a comfortable

6   complacency right up until the very day of Sentinel's collapse.

7

8   79.   It was no coincidence that AM&G became Sentinel's auditor in 2002 or

9   2003, right when the Illegal scheme began.

10

11  **Promotion of Sentinel**

12

13  80.   In mid April of 2004, while meeting with Don Varden, ANTC's CEO,

14  ("Varden") and other directors and officers of ANTC, in the office of ANTC's Vice

15  President and General Manager, Steve Roy, in Los Angeles to "brainstorm" and

16  discuss AM&G's audit of ANTC for ANTC's 2003 fiscal year, Nockels, "a very

17  close and trusted advisor to ANTC" told the ANTC principles that ANTC should be

18  using Sentinel to manage its funds. Nockels said that he had a longstanding personal

19  and business relationship Philip and Eric Bloom (the Sentinel Insiders) for many

20  years and that they were "good guys." Nockels also said that AM&G audited

21  Sentinel and that they, and he, knew it to be "a good firm, fully compliant with the

22  CFTC and CEA." Nockels further went on to list other firms that AM&G audited

23  that used Sentinel, and left a business card of Eric Bloom urging ANTC's principals

24  to call him.

25

26  81.   During the next few weeks Varden had multiple phone conversations

27  with Nockels to discuss Sentinel, during which, Nockels frequently reiterated what

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

"a good firm" Sentinel was, how "[AM&G] [did] the audits for [Sentinel] as well," and what a "good investment for [ANTC]" Sentinel would be.

82.  Varden also spoke to Kaplan over the phone in April of 2004, during ANTC's decision making process to use Sentinel. In his capacity as employee of AM&G, Kaplan told Varden that Sentinel was a "safe bet," that he had known "Eric and his father for over 20 years," and that AM&G audited Sentinel as well.

83.  Based on Nockels's and Kaplan's representations, ANTC hired Sentinel on April 27, 2004. Within two months of hiring Sentinel, Nockels called Varden to ask him if he had "invested with Sentinel." When Varden informed Nockels that ANTC had deposited over 10 million dollars for Sentinel to manage, Nockels said he was "sure [ANTC] would be happy with the results."

84.  On more than one occasion, during audits of ANTC in April 2005, 2006, and 2007, Nockels told Varden that there was no **"need to test Sentinel's numbers and statements"** because Nockels and his firm knew Sentinel and knew the statements to be correct.

85.  In addition, multiple times between 2004 and 2007, Sentinel would come up in conversations between ANTC executives Varden, Steve Roy, and Guy Zummo, and members of its auditing teams, including Nockels and Kaplan. These conversations took place via telephone, email, and in person. During these conversations, ANTC's auditors, including Nockels, would speak very highly of Sentinel and its principles.

1    86.   At no time, during any of the conversations between ANTC and

2 Kaplan, Nockels, or any of the other members of ANTC's auditing team, did any of

3 them inform ANTC about the Ponzi or Money Laundering schemes, or that their

4 previous statements were false or misleading in any way.

5

6    87.   In fact, it was not until after the collapse of Sentinel, that Kaplan

7 informed Varden that he "always though the Blooms were a little bit sleazy," a

8 complete turnabout from the position he had taken when he was trying to induce

9 ANTC to use Sentinel.

10

## Guidance to Avoid Regulation and Assistance in the Falsification and Fabrication of Documents

14    88.   In order to carry out the Illegal Schemes, Sentinel had to be careful that

15 it did not set off any regulatory alarms or alert its customers as a result of its

16 fraudulent dealings. Upon information and belief, Plaintiff alleges that Defendants

17 advised Sentinel regarding the effective concealment of the Illegal schemes from

18 regulators and clients.

19

20    89.   Upon information and belief, Plaintiff alleges that Defendants also

21 advised and assisted Sentinel in the falsification and fabrication of documents such

22 as the daily statements provided to Sentinel's customers, the monthly Form 1-FRs

23 sent to regulators, as well as other correspondence sent to customers and regulators

24 of Sentinel.

25

26    90.   Upon information and belief, Plaintiff alleges that Defendants Johnson,

27 other members of Sentinel's auditing teams, and employees of M&P, and/or its legal

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

predecessor AM&G, Assisted Sentinel in fabricating the asset lists, asset values, and asset cost basis that appeared on the daily statements sent to Sentinel's customers.

91.    Also, upon information and belief, Johnson, Plaintiff alleges that other members of Sentinel's auditing teams, and employees of M&P, and/or its legal predecessor AM&G, Assisted Sentinel in providing the false information regarding its segregation of customer assets which appeared in the statement of segregation on the form 1-FRs that Sentinel submitted monthly to regulators. That false information carried over into the statement of computation of minimum capital requirements on the Form 1-FR rendering that information false as well.

**Year End Financial Statements and Form 1-FRs, and SEC Rule 206(4)-2 Audit Reports**

92.    From 2003 until 2006, AM&G, falsified and fraudulently certified year end financial statements and year end Form 1-FRs for Sentinel, ANTC, and every other of AM&G's clients that were also using Sentinel, in order to further the Illegal schemes. In addition from 2003 until 2006, AM&G, falsified and fraudulently certified Sentinel's SEC Rule 206(4)-2 segregation audit reports.

93.    Similarly, for Sentinel's 2006 fiscal year, M&P, falsified and fraudulently certified year end financial statements and year end Form 1-FRs for Sentinel, ANTC, and every other of M&P's clients that were also using Sentinel, in order to further the Illegal schemes. In addition in 2006, M&P, falsified and fraudulently certified Sentinel's SEC Rule 206(4)-2 segregation audit report.

### i. Sentinel's Year End Financial Statements and Form 1-FRs, and SEC Rule 206(4)-2 Audit Reports

94. AM&G became generally aware of the Illegal schemes no later than 2003 through the knowledge of its employees and partners, such as Kaplan and Nockels, who had long-time personal relationships with Sentinel Insiders and, upon information and belief, were told about the schemes by the Insiders; through the knowledge of its employees and partners who were told about the scheme by Sentinel in the course of their advising and assisting Sentinel in the avoidance of regulation, and the fabrication and falsification of documents; through the preparation of Sentinel's SEC Rule 206(4)-2 segregation audit; and through the preparation of Sentinels 2003 year end audits and Form 1-FR.

95. As "one of the largest and most sophisticated practices specializing in the financial services industry" with extensive experience with respect to the "[a]pplication of SEC & CFTC Net Capital Rules, SEC Customer Protection Rules, [and] CFTC Segregation and Secured Rules," AM&G, and any of its partners and employees were acutely aware of CEA and CFTC rules and regulations that prohibited the comingling of customer funds, prohibited the use of customer funds for any purpose other than for the customer, and that required certain minimum capitalization amounts.

96. Thus, the Illegal schemes would have been blatantly obvious to AM&G (if it wasn't already aware of them as already discussed) no later than upon performing its 2003 SEC Rule 206(4)-2 audit of Sentinel which took place during Sentinel's 2003 fiscal year, and certainly no later than its 2003 year end audit which it performed in March of 2004.

1

2    97.    During its 2003 SEC Rule 206(4)-2 audit of Sentinel and its 2003 year

3    end audit of Sentinel, Sentinel's auditors reviewed BoNY records, Sentinel's

4    customers' statements, and Sentinel's own internal records. These records contained

5    glaring inconsistencies that provided stark evidence of the Illegal scheme.

6

7    98.    According BoNY's records, customer assets were not being held within

8    the proper segregated accounts, but instead were being held in the Collateral

9    Account where they were comingled with Sentinel's other funds. In addition,

10   BoNY's records indicated that several of the customer assets had been pledged as

11   collateral for the BoNY Loan.

12

13   99.    Further, according to Sentinel's records, Sentinel had purchased assets

14   using Repo transactions, in its own name, and used the BoNY loan to finance such

15   positions.

16

17   100.   Yet, the statements that Sentinel provided to its customers listed a

18   customer's purported assets as being in a segregated account, made no mention of

19   the BoNY loan or that any portion of the customers assets had been pledged as

20   collateral for the loan, and did not mention that any of the assets were encumbered

21   by Repo positions (or that those Repo assets were actually owned by Sentinel and

22   not the customer).

23

24   101.   In fact, this was precisely the case each year from 2003 until 2007, and

25   each year, the amount of customer assets illegally comingled and illegally pledged

26   as collateral for the BoNY Loan, and the number of assets purchased using Repo

27   transactions grew exponentially.

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

102.   As experts in CEA, CFTC, and SEC regulations, Sentinel's auditors, upon reviewing these documents clearly knew that Sentinel's practices were illegal.

103.   Despite this knowledge, every year, M&P, and its legal predecessor AM&G, would assist Sentinel in creating false year end financial statements and Form 1-FRs. Sentinel's auditors would assist Sentinel in reconciling its internal records with BoNY's records and the customer statements in order to further perpetrate the Illegal schemes.

104.   For example, each year, Sentinel's auditors would assist Sentinel in arbitrarily allocating the BoNY loan between customer segregated accounts, and arbitrarily allocating customer assets as collateral for the BoNY Loan, on its books and balance sheets, in order to give the appearance that the BoNY loan was not for the direct benefit and use of Sentinel, and was not illegally secured with comingled customer funds.

105.   Despite knowing that the information contained in Sentinel's year end financial statements for Sentinel's fiscal years 2003-2006 was false and misleading, in part because they fabricating some or all of it themselves, Sentinel's auditors never-the-less certified each and every one of those year end financial statements.

106.   To be clear, the financial statements for Sentinel's fiscal years 2003-2006, which its auditors fraudulently certified, were false and misleading for the following reasons:

a) They falsely listed securities that should have been segregated for customers as Sentinel assets;

b) They falsely stated that assets pledged for the BoNY Loan were held in segregation;

c) They falsely understated the amount of assets pledged to collateralize the BoNY Loan;

d) They misstated the purpose of the BoNY Loan;

e) They falsely stated the nature and extent of the Repo transactions, the market risk associated with such transactions, and that the Repo transactions did not appear on customer statements; and

f) They falsely stated that Sentinel was fully compliant with all relevant laws, rules, and regulations.

107.    Similarly, Sentinel's auditors fraudulently certified Sentinel's Form 1-FRs

108.    for each of Sentinel's fiscal years from 2003 to 2006. For the reasons already discussed, Sentinel's auditors knew the information contained in the Form 1-FRs was false, but they certified them anyway.

109.    The Form 1-FRs were all false or misleading because they falsely stated that the value of the assets held in segregated accounts was enough to meet its client obligations (in other words, that the client's assets were being kept in segregated accounts), and they falsely stated the amount of assets and liabilities in the net capital computations.

110.    Finally, Sentinel's auditors fraudulently certified Sentinel's SEC Rule 206(4)-2 segregation audit reports for each of Sentinel's fiscal years from 2003 to

1   2006. For the reasons already discussed, Sentinel's auditors knew the information

2   contained in the SEC Rule 206(4)-2 segregation audit reports was false, but they

3   certified them anyway.

4

5      111.   The SEC Rule 206(4)-2 segregation audit reports were false or

6   misleading because they falsely stated that Sentinel's auditors had examined all of

7   Sentinel's clients' assets, and that they were properly segregated.

8

9   **ANTC's Year End Financial Statements and Form 1-FRs**

10

11      112.   At the same time that AM&G, and then after the merger M&P, was

12   falsifying documents for and with Sentinel, and fraudulently certifying Sentinel's

13   year end financial statements, Form 1-FRs, and SEC Rule 206(4)-2 segregation

14   audit reports, it was also fraudulently certifying the year end financial statements

15   and Form 1-FRs of all its other client's that were customers of Sentinel. In such a

16   way, AM&G, and then after the merger M&P, provided a one, two punch that

17   provided the perfect cover for the Illegal to continue unabated.

18

19      113.   As already mentioned, AM&G, and then after the merger M&P, was

20   both ANTC's and Sentinel's auditors. Furthermore, as already discussed, ANTC's

21   auditors Kaplan and Nockels had longstanding relationships with Philip and Eric

22   Bloom. For these reasons, and those already discussed, at all relevant times,

23   ANTC's auditors were not only aware of the Illegal scheme, but intended to further

24   it (by at the very least concealing its existence) from ANTC and its other auditing

25   clients.

26

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1    114.   To that end, ANTC's auditors fraudulently certified ANTC's year end

2    financial statements and ANTC's Form 1-FRs for ANTC's fiscal years 2003-2006.

3

4    115.   These year end financials and Form 1-FRs were false and misleading

5    because they falsely stated that ANTC's customer funds were properly segregated,

6    that ANTC's funds deposited with Sentinel posed no material risk, and that ANTC

7    was generally in full compliance with CEA and CFTC rules and regulations. Of

8    course those statements were false because, as ANTC's auditors knew, ANTC's

9    assets deposited with Sentinel were not segregated and were improperly pledged as

10   collateral for the BoNY Loan, and hence ANTC's customers' funds were not

11   segregated as required by law and were being illegally pledged to collateralize the

12   BoNY Loan. Further, given ANTC's auditor's knowledge that Sentinel was

13   incredibly overleveraged and did not meet minimum capital requirements, they

14   knew that ANTC's assets, purportedly under Sentinel's "management," posed a

15   substantial risk to ANTC.

16

17   116.   Plaintiffs allege on information and belief that in this way AM&G, and

18   then after the merger M&P, were able to trick numerous Sentinel clients, including

19   ANTC, that Sentinel was a safe, effective, and fully compliant business, and were

20   able to maintain that façade right up until the very day of Sentinel's collapse under

21   the weight of its extensive overleveraging and undercapitalization.

22

23   **Participation in Money Laundering**

24

25   117.   Defendants also substantially participated in the Money Laundering

26   aspect of the scheme. By creating, and assisting in the creation of false documents

27   and information, and by fraudulently certifying Sentinel's and many of its

28

1   customers' year end financials and Form 1-FR, all as discussed above, Defendants

2   substantially assisted Sentinel in concealing the source of its income, by creating

3   pretexts for the source of the revenue and for the transfer of the revenue to different

4   accounts where it could be extracted.

5

6       118.   For example, in 2007, M&P assisted Eric Bloom in the creation of a

7   backdated agreement which Bloom used as a pretext to transfer ill-gotten gains from

8   the Ponzi scheme to SIG, a company that Bloom controlled.

9

10       119.   M&P was aware that the insiders were using SIG to launder funds, but

11   was concerned that without some type of agreement to justify the transfer of the

12   funds, the transfers might garner unwanted regulatory attention. Accordingly, M&P

13   informed Bloom that he should create a back dated agreement to create a cover for

14   the transfers of funds, which Bloom subsequently did.

15

16       120.   As a result, the Insiders were able to launder countless millions of

17   dollars through SIG, all with the help of M&P and Johnson.

18

19   **Motivation**

20

21       121.   Upon information and belief, Kaplan, Nockels, Johnson, and other

22   employees and principles of AM&G, and then M&P after the merger, received

23   bribes, kickbacks, and other things of value from Sentinel in exchange for their

24   participation and cooperation.

25

26       122.   Bribery was a big part of Sentinel's corporate culture. With at least one

27   Sentinel Insider, Mosley, purportedly receiving frequent lap dances, VIP tickets to

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1   sporting events, all expense paid vacations, cash, and other things of value, it is

2   apparent that bribery was widely received and used by the Sentinel Insiders. After

3   all, Chicago is considered the most corrupt city, per capita, in the United States.

4

5       123.   In addition to bribery, many of the employees and principles of

6   AM&G, and then M&P after the merger, had close, longstanding personal

7   relationships with the Sentinel Insiders. As one industry insider has said: "The

8   futures industry in Chicago is very small and tight knit. All the big players know one

9   another, and in fact they all grew up together as kids, and now their kids all play

10  together." As already discussed, Kaplan and Nockels had extremely close

11  relationships with Philip and Eric Bloom, and it certainly stands to reason that others

12  involved did as well.

13

14      124.   Finally, whistle blowers would get black listed. As discussed, the

15  Futures industry in Chicago is extremely close knit. If an auditor blew the whistle

16  against one of his clients, it would most certainly mean he or she would never work

17  again.

18

19      125.   This is particularly evident in the case of Johnson, who has already

20  been disciplined for participating in the fraud perpetrated by one of his previous

21  clients. Johnson and AM&G, in 2004, settled with the CFTC for their involvement

22  in the fraud of another CFTC registrant, Melrose and Lofgren. In their consent order

23  with the CFTC, Johnson and AM&G admitted to certifying materially misstated

24  financial statements. Johnson and AM&G were fined a total of over $300,000 for

25  their involvement. Clearly Johnson would rather have accepted the fine and

26  discipline, then not participating in the fraud and risking never working again.

27

28

126.   Since an auditor only has three choices, report the fraud of his client, withdraw, or knowingly participate in the client's fraud, and if the first and second choice guarantee that the auditor will never work again, it is no wonder that auditors would chose to knowingly participate in their client's fraud and then hide behind plausible deniability if they get caught.

127.   Thus, M&P benefited by securing continued business from Sentinel, and by using its audit relationship with Sentinel to secure additional business and market itself as having particular expertise in auditing companies subject to SEC and CFTC regulations.

## **MALPRACITCE**

128.   In light of the above, it goes without saying that M&P, and its legal predecessor AM&G, breached its professional duty to ANTC to perform its audits of Sentinel and ANTC, for all relevant years, with the requisite skill and care.

## **FAILURE TO REPORT**

129.   Under CFTC regulations, applicable auditing standards, and the terms of M&P's engagement letters with Sentinel and ANTC, M&P was required to report known violations of law, including violations of CFTC and SEC regulations, and material inadequacies in Sentinel's or ANTC's internal controls and procedures.

130.   M&P failed to fulfill that obligation. M&P knew of Sentinel's violation of (a) CFTC Rule 1.20's segregation requirements; (b) CFTC Rule 1.20's prohibition against the pledging of securities that should have been segregated for

1   customers to collateralize a bank loan; (c) CFTC Rule 1.17's net capital

2   requirements; (d) SEC Rule 206(4)-2's custody requirements; and (e) SEC Rule

3   206(4)-4's requirement to provide customers with information regarding financial

4   conditions reasonably likely to impair Sentinel's ability to meet commitments to

5   customers.

6

7       131.   Correspondingly, M&P also knew of ANTC's violation of (a) CFTC

8   Rule 1.20's segregation requirements; (b) CFTC Rule 1.20's prohibition against the

9   pledging of securities that should have been segregated for customers to

10   collateralize a bank loan; and (c) CFTC Rule 1.17's net capital requirements, by

11   virtue of the fact that it knew of Sentinel's violations and that ANTC had funds

12   deposited with Sentinel.

13

14       132.   Similarly, M&P refused to report the material inadequacies in

15   Sentinel's controls and procedures that caused or permitted the above violations and

16   other activity that inhibited Sentinel's ability to satisfy its obligations to customers

17   and had the potential to lead to material financial losses.

18

19       133.   Numerous documents M&P reviewed and helped to create as part of

20   its audits of Sentinel clearly demonstrated violations of the above regulations and

21   other material inadequacies, which Sentinel's financial statements and year-end

22   Form 1-FR obfuscated and which M&P refused to report.

23

24       134.   M&P not only refused to report the above-described violations and

25   material inadequacies in its audit report, but it also failed to ensure that these

26   violations and material inadequacies were reported to the CFTC and NFA. Had

27   M&P fulfilled its responsibilities, Sentinel would not have been permitted to

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  continue its operations and/or ANTC would have had to withdraw its funds from
2  Sentinel, and its subsequent losses and related damages would have been avoided.

3

4                              **LOSS CAUSATION**

5

6      135.   It was reasonably foreseeable to M&P that ANTC would suffer losses
7  as a result of M&P's misconduct. M&P was aware of the Ponzi scheme and that
8  Sentinel's extreme overleveraging and undercapitalization would not only lead to its
9  collapse, but its inability to honor customer withdrawals upon such a collapse.

10

11     136.   It was also known to M&P that CEA and CFTC regulations required
12  ANTC to deposit its funds only in other CEA and CFTC compliant FCM's, and if
13  ANTC were to suffer a loss as a result of being unable to withdraw its customer
14  funds from Sentinel, then ANTC would be personally liable to come up with those
15  funds (that is to say, ANTC's customers bore no risk of loss due to their funds not
16  being recoverable from Sentinel.

17

18     137.   Therefore, it was reasonably forseeable that ANTC would suffer
19  substantial losses as a result of Sentinel's collapse.

20

21     138.   By participating in the Sentinel Insiders' misconduct and regulatory
22  violations, failing to properly assess the risks associated with Sentinel's operations,
23  and certifying financial statements that concealed the misconduct and falsely
24  portrayed Sentinel's financial condition, M&P substantially contributed to and
25  caused hundreds of millions of dollars in losses and related damages in 2007. The
26  material misstatements and omissions in Sentinel's financial statements and

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1  deficiencies in M&P's audit procedures directly related to the financial

2  circumstances and activity that led to Sentinel's demise.

3

4      139.   In late June and early July 2007, Sentinel's two primary repo

5  counterparties decided to stop rolling forward higher-risk repo transactions with

6  Sentinel and insisted on repayment of the repo loans. Because Sentinel could not

7  finance those payments in any other way, on June 1, 2007, it borrowed an additional

8  $94 million from BoNY, increasing its total loan balance to more than $353 million.

9

10      140.   Shortly thereafter, Sentinel's repo counterparties refused to roll

11  forward many more repo transactions. As a result, Sentinel continued borrowing

12  money from BONY, and throughout June and July 2007, the outstanding loan

13  balance ballooned. To collateralize the additional loan amounts, the Sentinel

14  Insiders and BoNY continued to transfer securities between the various Seg

15  accounts and the BoNY Collateral account in an attempt to fill various shortfalls.

16

17      141.   Sentinel's severe financial stress continued through the end of July and

18  into August as it was unable to simultaneously reduce its loan balance with BoNY,

19  sell the higher-risk securities it had received back from repo counterparties that had

20  stopped financing such securities, and meet its redemption obligations to customers

21  who wanted to withdraw funds. The financial risks coupled with its severe

22  undercapitalization, neither of which was identified in Sentinel's 2006 financial

23  statements or in M&P's 2006 audit report despite M&P's full knowledge of such,

24  crushed Sentinel, and the undisclosed segregation violations left Sentinel unable to

25  fulfill its obligations to its customers, including ANTC.

26

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

142.   As a result of Sentinel's collapse, which resulted in the NFA action on or about August 13, 2008, ANTC was forced to sell its assets in a fire sale, all as hereinabove alleged.

143.   At the time of Sentinel's collapse, ANTC had approximately 17 Million dollars under Sentinel's management. However, as a result of Sentinel's Illegal scheme, ANTC was only able to recover approximately 12 Million dollars of its funds. Due to the stringent CFTC regulations, this 4.5 Million dollar shortfall immediately put ANTC in non-compliance with CFTC regulations, and as a result, ANTC had only two days to come up with the missing 4.5 Million dollars or risk being shut down by regulators. Unfortunately, ANTC did not have enough liquid assets to cover the 4.5 Million dollar shortfall and was forced to undergo a fire sale of its assets to cover the deficiency. Of course this fire sale came at a great loss to ANTC, which amongst other things, was no longer able to conduct its business thereafter.

144.   At the time of ANTC's forced fire sale of its assets, ANTC had recently entered into contracts for substantially increased volume and sales, of which M&P and Nockels were aware, and the profits of which were denied to ANTC due to the fire sale of its assets.

145.   If M&P had fulfilled its obligations to ANTC and delivered accurate audit reports for either ANTC or Sentinel in March or April of 2007, ANTC would have had no choice but to withdraw its funds from Sentinel unless Sentinel changed its operations. Furthermore, if at anytime prior to April 2007 M&P, and/or its legal predecessor AM&G, had fulfilled its obligations to ANTC and delivered accurate audit reports and other documents for either ANTC or Sentinel, or reported the

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1   Illegal scheme to ANTC or regulators, ANTC would have withdrawn its funds and

2   used one of the other readily available asset managers. Thus, ANTC would have

3   avoided its losses entirely.

4

5                            **COUNT ONE**

6   **(Malpractice based on Breach of Contract against M&P and Nockels)**

7

8      146.   Plaintiff restates and realleges paragraphs 1 through 145 of this

9   Complaint as though fully set forth herein.

10

11      147.   At all relevant times, M&P acted as ANTC's as well as Sentinel's

12   independent auditor.

13

14      148.   M&P and Nockels owed ANTC a duty of care and loyalty under its

15   2006 audit contract.

16

17      149.   Specifically, M&P and Nockels had a contractual duty to "report

18   whether [they] believe[d] ANTC's procedures are adequate for the [CFTC's]

19   purposes. In addition, [their] report will set forth those conditions, if any, which

20   [they] believe are material weaknesses in relation to Regulation 1.16(d)," and

21   "communicate any…fraud that causes a material misstatement of the financial

22   statements, [and] (b) illegal acts that come to our attention (unless clearly

23   inconsequential)."

24

25      150.   By knowingly and intentionally certifying ANTC's 2006 financial

26   statements and 2006 Form 1-FR despite their knowledge that the information they

27   contained was false by virtue of their knowledge of the Illegal scheme, by not

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1   disclosing in the 2006 audit report of ANTC or to regulators that ANTC's deposit of

2   funds with Sentinel caused it to be in CFTC non-compliance, again by virtue of their

3   knowledge of the Illegal scheme, and by all of their other conduct as hereinabove

4   alleged, M&P and Nockels breached their contractual duties to ANTC.

5

6   151.   ANTC was damaged as a direct and proximate consequence of the

7   conduct of Defendants and each of them, in amounts that exceed Fifty Million

8   ($50,000,000) or otherwise as shown according to proof.

9

10   ## COUNT TWO

11   ### (Professional Malpractice against M&P and Nockels)

12

13   152.   Plaintiff restates and realleges paragraphs 1 through 151 of this

14   Complaint as though fully set forth herein.

15

16   153.   At all relevant times, M&P acted as ANTC's as well as Sentinel's

17   independent auditor; thus privity of contract existed between M&P and ANTC.

18

19   154.   Defendants owed ANTC a duty of care and loyalty under its

20   engagement to, among other things perform independent, objective, and thorough

21   audits of Sentinel's businesses, books, records and financial statements in

22   accordance with applicable standards, and report violations of, at a minimum, the

23   segregation and minimum net capital requirements of the CFTC and SEC.

24

25   155.   All of the conduct of Defendants, as hereinabove alleged, fell below

26   and breached their duties and the standard of care owed to ANTC.

27

28

156.    ANTC was damaged as a direct and proximate consequence of the conduct of M&P and Johnson and each of them, in amounts that exceed Fifty Million ($50,000,000) or otherwise as shown according to proof.

## COUNT THREE
### (Malpractice based on Breach of Contract against M&P and Johnson)

157.    Plaintiff restates and realleges paragraphs 1 through 156 of this Complaint as though fully set forth herein.

158.    At all relevant times, M&P acted as ANTC's as well as Sentinel's independent auditor; thus privity of contract existed between M&P and ANTC.

159.    In addition, M&P and its legal predecessor AM&G, through Kaplan, Nockels, and other employees and principles, provided ANTC with information about Sentinel, which it represented was derived from, amongst other things, its audits of Sentinel and other accounting services it provided, for the express purpose of inducing ANTC to invest its customer funds in Sentinel.

160.    Therefore, M&P and Johnson owed ANTC, as a third party beneficiary, a contractual duty of care and loyalty under M&P's 2006 audit contract with Sentinel.

161.    Specifically, M&P and Johnson had a contractual duty to "report whether [they] believe[d] Sentinel's procedures are adequate for the [CFTC's] purposes. In addition, [their] report will set forth those conditions, if any, which [they] believe are material weaknesses in relation to Regulation 1.16(d)," and

"communicate any…fraud that causes a material misstatement of the financial statements, [and] (b) illegal acts that come to our attention (unless clearly inconsequential)."

162.  By knowingly and intentionally certifying Sentinel's 2006 financial statements and 2006 Form 1-FR despite their knowledge that the information they contained was false by virtue of their knowledge of the Illegal scheme, by not disclosing in the 2006 audit report of Sentinel or to regulators that Sentinel was in CFTC non-compliance, again by virtue of their knowledge of the Illegal scheme, and by all of their other conduct as hereinabove alleged, M&P and Johnson breached their contractual duties to ANTC.

163.  ANTC was damaged as a direct and proximate consequence of the conduct of Defendants and each of them, in amounts that exceed Fifty Million ($50,000,000) or otherwise as shown according to proof.

## COUNT FOUR

### (Professional Malpractice against M&P and Johnson)

164.  Plaintiff restates and realleges paragraphs 1 through 164 of this Complaint as though fully set forth herein.

165.  At all relevant times, M&P acted as ANTC's as well as Sentinel's independent auditor; thus privity of contract existed between M&P and ANTC.

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

166.   In addition, M&P and its legal predacesor AM&G, through Kaplan, Nockels, and other employees and principles, provided ANTC with information about Sentinel, which it represented was derived from, amongst other things, its audits of Sentinel and other accounting services it provided, for the express purpose of inducing ANTC to invest its customer funds in Sentinel.

167.   By virtue of their representations to ANTC, M&P and Johnson owed ANTC a duty of care, among other things, refrain from negligent referral, and thereafter to perform independent, objective, and thorough audits of Sentinel's businesses, books, records and financial statements in accordance with applicable standards, and report violations of, at a minimum, the segregation and minimum net capital requirements of the CFTC and SEC.

168.   All of the conduct of M&P and Johnson, as hereinabove alleged, fell below and breached their duties and the standard of care owed to ANTC.

169.   ANTC was damaged as a direct and proximate consequence of the conduct of M&P and Johnson and each of them, in amounts that exceed Fifty Million ($50,000,000) or otherwise as shown according to proof.

**COUNT FIVE**

**(Aiding and Abetting/Knowing Participation in Breach of**

**Fiduciary Duty against M&P and Johnson)**

170.   Plaintiff restates and realleges paragraphs 1 through 169 of this Complaint as though fully set forth herein.

171.   At all times relevant to this Complaint, the Sentinel Insiders were officers and directors of Sentinel.

172.   As officers and directors of Sentinel, the Sentinel Insiders owed fiduciary duties to Sentinel, including a duty of loyalty, and a duty to act with due care and to deal honestly and fairly with Sentinel.

173.   The Sentinel Insiders caused Sentinel to engage in a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, causing Sentinel to violate the CEA and CFTC regulations, and Investment Advisers Act and SEC regulations, and to incur hundreds of millions of dollars in losses and related damages.

174.   Specifically, the Sentinel Insiders breached their fiduciary duties to Sentinel by, among other things: commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BoNY Loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BoNY Loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, borrowing funds from BoNY far in excess of Sentinel's ability to repay, concealing from customers the use of leveraging through bank loans and repurchase agreements, providing false reports to

LAW OFFICES
WOLF GROUP L.A.
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1   federal regulators, and embezzeling money from Sentinel through the use of

2   fictitious agreements and other such artifices.

3

4   175.   M&P and Johnson knowingly participated in, aided, assisted and

5   benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of

6   their fiduciary duties to Sentinel as hereinabove alleged.

7

8   176.   The same auditors involved in the 2006 audit had been involved in

9   prior Sentinel audits. M&P, and/or its legal predecessor AM&G, profited from the

10   continued business relationship with Sentinel and certified Sentinel's 2003 to 2006

11   financial statements despite its knowledge of numerous material misstatements for

12   the purpose of continuing the relationship with Sentinel. M&P, and/or its legal

13   predecessor AM&G used its audit relationship with Sentinel to secure additional

14   business and market itself as having particular expertise in auditing companies

15   subject to SEC and CFTC regulations and received other items of value.

16

17   177.   ANTC has been damaged as a direct and proximate cause of M&P's

18   and Johnson's knowing participation in and aiding and abetting of the Sentinel

19   Insiders' breaches of their fiduciary duties, in amounts that exceed Fifty Million

20   ($50,000,000) or otherwise as shown according to proof.

21

22   **COUNT SIX**

23   **(Fraud against M&P and Nockels )**

24

25   178.   Plaintiff restates and realleges paragraphs 1 through 177 of this

26   Complaint as though fully set forth herein.

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

179.   Beginning in April of 2004, M&P, and/or its legal predecessor AM&G, through Nockels, Kaplan or other employees and principles, knowingly provided fraudulent information to ANTC regarding the financial strength and stability of Sentinel and its principles, and the status of its compliance with CFTC and SEC regulations, as well as ANTC's own compliance with CFTC regulations after it hired Sentinel.

180.   M&P, and/or its legal predecessor AM&G, also released fraudulent audit statements and other materials pertaining to Sentinel.

181.   The information M&P, and/or its legal predecessor AM&G, provided was based on the accounting services it had provided for Sentinel and pertained to material aspects of Sentinel's operations and capital structure and was intended to induce ANTC into using Sentinel, and thereafter to continue using Sentinel.

182.   M&P, and/or its legal predecessor AM&G, intended to deceive ANTC into thinking that Sentinel was a safe and reliable investment or at the very least, M&P or its legal predecessor AM&G, lacked a good faith belief in the truth of its statements.

183.   ANTC justifiably relied upon its accountants fraudulent statements regarding the financial strength and safety of one of its other clients, hired Sentinel, and continued to use Sentinel until the day of its collapse.

184.   As a direct and proximate cause of ANTC's use of Sentinel in reliance upon M&P's fraudulent misrepresentations regarding the financial strength and stability of Sentinel, ANTC was damaged by the conduct of M&P and Nockels and

1  each of them, in amounts that exceed Fifty Million ($50,000,000) or otherwise as
2  shown according to proof.

3

4                          **COUNT SEVEN**

5          **(Negligent Misrepresentation against M&P and Nockels )**

6

7      185.   Plaintiff restates and realleges paragraphs 1 through 184 of this
8  Complaint as though fully set forth herein.

9

10     186.   Beginning in April of 2004, M&P, and/or its legal predecessor AM&G,
11  through Nockels, Kaplan or other employees and principles, provided false
12  information to ANTC regarding the financial strength and stability of Sentinel and
13  its principles, and the status of its compliance with CFTC and SEC regulations, as
14  well as ANTC's own compliance with CFTC regulations after it hired Sentinel.

15

16     187.   M&P, and/or its legal predecessor AM&G, knew that the information
17  was supplied to guide ANTC in its operations strategy to use Sentinel as its asset
18  manager.

19

20     188.   M&P, and/or its legal predecessor AM&G, was negligent in obtaining
21  and communicating the false information to ANTC since it failed to perform its
22  accounting of Sentinel or ANTC with a level of skill commensurate with the
23  applicable accounting standards, and since it knew, should have known, or failed to
24  make the necessary investigations to discover that Sentinel's operations violated
25  CFTC and SEC regulations, as mentioned above.

26

27

28

LAW OFFICES
WOLF GROUP L.A.
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

189.   ANTC relied on the false information supplied by M&P, and/or its legal predecessor AM&G.

190.   ANTC's reliance on the false information was justified.

191.   ANTC was damaged as a direct and proximate consequence of the conduct of M&P and Nockels and each of them, in amounts that exceed Fifty Million ($50,000,000) or otherwise as shown according to proof.

## COUNT EIGHT

### (Fraud against M&P and Johnson )

192.   Plaintiff restates and realleges paragraphs 1 through 191 of this Complaint as though fully set forth herein.

193.   M&P, and/or its legal predecessor AM&G, through Johnson and other principles and employees, knowingly provided fraudulent information, via Sentinel's year end financial statements for 2003 to 2006, Sentinel's audit statements from 2003 to 2006, Sentinel's year end 1-FRs for 2003 to 2006, and SEC Rule 206(4)-2 segregation audits for 2003 to 2006, to ANTC regarding the financial strength and stability of Sentinel and the status of its compliance with CFTC and SEC regulations.

194.   The information M&P, and/or its legal predecessor AM&G, provided was based on the accounting services it had provided for Sentinel and pertained to material aspects of Sentinel's operations and capital structure and was intended to induce ANTC into using Sentinel, and thereafter to continue using Sentinel.

195.   M&P, and/or its legal predecessor AM&G, intended to deceive ANTC into thinking that Sentinel was a safe and reliable investment or at the very least, M&P lacked a good faith belief in the truth of its statements.

196.   ANTC justifiably relied upon its accountants fraudulent statements regarding the financial strength and safety of one of its other clients, hired Sentinel, and continued to use Sentinel until the day of its collapse.

197.   As a direct and proximate cause of ANTC's maintenance of its investment in Sentinel securities in reliance upon M&P's fraudulent misrepresentations regarding the financial strength and stability of Sentinel, ANTC was damaged in amounts that exceed Fifty Million ($50,000,000) or otherwise as shown according to proof.

## COUNT NINE

### (Negligent Misrepresentation against M&P and Johnson )

198.   Plaintiff restates and realleges paragraphs 1 through 197 of this Complaint as though fully set forth herein.

199.   M&P, and/or its legal predecessor AM&G, through Johnson and other principles and employees, provided false information, via Sentinel's year end financial statements for 2003 to 2006, Sentinel's audit statements from 2003 to 2006, Sentinel's year end 1-FRs for 2003 to 2006, and SEC Rule 206(4)-2 segregation audits for 2003 to 2006, to ANTC regarding the financial strength and

1  stability of Sentinel and the status of its compliance with CFTC and SEC

2  regulations.

3

4    200.  M&P, and/or its legal predecessor AM&G, knew that the information

5  was supplied to guide ANTC in its operations strategy, vis a vi to use Sentinel as its

6  asset manager.

7

8    201.  M&P, and/or its legal predecessor AM&G, was negligent in obtaining

9  and communicating the false information to ANTC since it failed to perform its

10  accounting of Sentinel with a level of skill commensurate with the applicable

11  accounting standards, and since it knew, should have known, or failed to make the

12  necessary investigations to discover that Sentinel's operations violated CFTC and

13  SEC regulations, as mentioned above.

14

15    202.  ANTC relied on the false information supplied by M&P, and/or its

16  legal predecessor AM&G.

17

18    203.  ANTC's reliance on the false information was justified.

19

20    204.  ANTC was damaged as a direct and proximate consequence of the

21  conduct of M&P and Johnson and each of them, in amounts that exceed Fifty

22  Million ($50,000,000) or otherwise as shown according to proof.

23

24                          **COUNT TEN**

25  **(Aiding and Abetting a Violation of the Commodities Exchange Act, 7 USC §25**

26                    **Against M&P, Johnson, and Nockels)**

27

28

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

LAW OFFICES
WOLF GROUP L.A
ELLEN K. WOLF; PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064

1    205.   Plaintiff restates and realleges paragraphs 1 through 204 of this

2  Complaint as though fully set forth herein.

3

4    206.   At all times alleged herein, Sentinel was "non-registered" for the

5  purposes of the CEA.

6

7    207.   Sentinel, as discussed above, violated 7 USC §§6d(a)(2) (no

8  comingling of funds) and 6d(b) (improper use of deposited funds), and CFTC Rules

9  1.20(a) (no comingling of funds), 1.25 (investment restrictions), and 1.17 (minimum

10  capital requirements.

11

12    208.   ANTC deposited money or property with Sentinel in connection with

13  orders to buy or sell commodities for future delivery and/or placed orders with

14  Sentinel for the purchase or sale of an interest or participation right in a commodity

15  pool.

16

17    209.   M&P, and/or its legal predecessor AM&G, Nockels, and Johnson had

18  knowledge of Sentinel's intent to violate the CEA.

19

20    210.   M&P, and/or its legal predecessor AM&G, Nockels, and Johnson

21  intended to further Sentinels violations of the CEA.

22

23    211.   M&P, and/or its legal predecessor AM&G, Nockels, and Johnson

24  created and certified false documents, made fraudulent misrepresentations to

25  regulatory agencies and Sentinel's clients, and fraudulently induced Sentinel's

26  clients hire and continue to use Sentinel, all in furtherance of Sentinel's objectives.

27

28

212.   As a direct and proximate result thereof, M&P, and/or its legal predecessor AM&G, Nockels, and Johnson, and each of them, are liable for aiding and abetting a violation of the CEA in violation of 7 USC §25.   Plaintiff has been damaged in a sum in excess of $50 million dollars ($50,000,000) or as otherwise to be shown according to proof.

213.   Plaintiff is entitled to recover, pursuant to Title 7 U.S.C Section 25, damages in an amount to be determined by proof at trial. Plaintiff is also entitled to recover reasonable attorneys' fees and costs of this litigation.

## COUNT ELEVEN

### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c), 1964(c) Against M&P)

214.   Plaintiff restates and realleges paragraphs 1 through 213 of this Complaint as though fully set forth herein.

215.   M&P, and/or its legal predecessor AM&G, Sentinel, and BoNY, formed an association-in-fact enterprise (the "Enterprise") with the common purpose of commercially profiting from attracting and maintaining clients, and managing their funds and assets.

216.   At all times herein alleged, the Enterprise's structure consisted of M&P, and/or its legal predecessor AM&G, Sentinel, and BoNY.

217.   At all times herein alleged, the Enterprise's structure was distinct from that inherent in a pattern of racketeering.

LAW OFFICES
WOLF GROUP L.A.
ELLEN K. WOLF, PROFESSIONAL CORPORATION
11400 WEST OLYMPIC BOULEVARD
SUITE 200
LOS ANGELES, CALIFORNIA 90064